IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| JONATHAN GOERIG | : | NO.  20-137 |

## MEMORANDUM

**Padova, J.**                                                          **December 28, 2021**

Defendant Jonathan Goerig has been charged in a Superseding Indictment with one count of travel with the intent to engage in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(b); four counts of manufacture and attempted manufacture of child pornography, in violation of 18 U.S.C. § 2251(a); three counts of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).   He moves to suppress evidence that was seized following his stop, motor vehicle search, and arrest on June 7, 2019 in the parking lot of the Ridley Township High School.   Specifically, he seeks to suppress a vacuum constriction device, a towel, his cell phone and its contents, his wallet and its contents, two bottles of alcohol, his statements to the arresting officers on June 7, 2019, the contents of his iCloud account, and his alleged child victim's cellphone and iPad, as well as their contents.   We held an evidentiary hearing on December 9, 2021, after which both the Government and Defendant filed proposed findings of fact and conclusions of law.   For the following reasons, we now deny Defendant's Motion.

## I.        FACTUAL FINDINGS

We find the following facts based on the testimony and evidence introduced in connection with our December 9, 2021 hearing.[1]   On June 7, 2019, at approximately 11:00 a.m., Ridley Township

---

[1] In finding these facts, we credit the hearing testimony from the Government's witnesses and the child victim, and we largely find Defendant's testimony to be not credible.

received a 911 call concerning a "suspicious person" in the Ridley Township High School parking lot. (N.T. 12/9/21 at 7, 91; Gov't Ex. 14.)  Ridley Township police officer Corporal ("Cpl.") Leo Doyle, a member of Delaware County's Internet Crimes Against Children Task Force ("ICAC"), was on patrol when he received a call from dispatch about this 911 call.  (N.T. 12/9/21 at 6-8.)  Dispatch stated that there was a suspicious vehicle at the high school – specifically, a white male about 30 years of age, sitting in a black Ford pickup truck with Connecticut registration, in the parking lot, facing the tennis courts.  (Id. at 9, 57.)  The dispatcher stated that the male's truck might be disabled and that he had asked the 911 caller for a jump.  (Id. at 62.)  Cpl. Doyle also received a 911 event report over the computer terminal in his car (id. at 12-15), which added that the man "seemed very nervous, agrivated" and "look[ed] out of place" (Gov't Hrg. Ex. 1 at 1).

When Cpl. Doyle arrived at the high school parking lot, approximately two minutes after receiving the call from dispatch, at 11:08 a.m., he identified a black Ford F-150 truck with out-of-state plates.  (N.T. 12/9/21 at 10, 16; Gov't Hrg. Ex. 1 at 2.)  The truck was in a secondary parking lot at the high school, where he knew parents to park to pick put their children in order to avoid the congestion of the main parking lot.  (N.T. 12/9/21 at 17-18.)  The truck was parked near to the tennis courts, away from where parents typically park in that lot, which was closer to the main entry and exit point of the lot.  (Id.)  There were students in the vicinity because it was a half day of school and students were being dismissed.  (Id. at 17.)

Cpl. Doyle pulled his police car into the parking space to the left of the truck.  (Id. at 23; see also id. at 106, 164.)  He exited his vehicle, walked around the back of his car, and approached the individual in the driver's seat of the truck, whose window was down.  (Id. at 24-26.)  As Cpl. Doyle approached the driver's seat window, he observed Defendant lean over the middle console of the truck,

then put his hands down towards his legs, push up, and re-situate himself in his seat.[2]  (Id. at 27, 102-103.)  He described these movements as "furtive."  (Id. at 25.)  Defendant's hands were not visible to Cpl. Doyle at this time.  (Id. at 73.)  When Cpl. Doyle arrived at the window, he asked Defendant what had brought him to the parking lot and Defendant said he was meeting with a "friend."  (Id. at 29-30.)  Cpl. Doyle did not consider this answer to be responsive.  (Id. at 30.)  Cpl. Doyle also thought that Defendant seemed nervous, noting that he was sweating and seemed agitated.  (Id. at 30.)  In light of Defendant's demeanor and the movements that Cpl. Doyle had observed as he approached the vehicle, Cpl. Doyle believed that Defendant might be armed.  (Id. at 28.)  Cpl.  Doyle asked to see Defendant's driver's license.  (Id. at 31.)  When Defendant turned away from Cpl. Doyle to recover the license, Cpl. Doyle kept his eyes on Defendant's waistband, looking to see if a weapon might be concealed there and, in doing so, he saw that Defendant's shorts were partially down, and the skin on the side of his buttocks was visible.  (Id. at 31, 84.)  After Defendant handed Cpl. Doyle his driver's license, Cpl. Doyle saw that the license had been issued in Connecticut and that Defendant was 26 years old.  (Id. at 32.)  Around this same time, Cpl. Doyle also observed that the back seat of the truck was covered by a towel.  (Id. at 29-30; see also Gov't Hrg. Ex. 7.)

Because Cpl. Doyle was concerned that Defendant might be armed and was also concerned for his own safety and that of the students in the vicinity, he asked Defendant some additional questions about his route from Connecticut to the high school that day as a way to stall while he waited for back-up to arrive.  (N.T. 12/9/21 at 35-36, 76-77.)  During this questioning, Defendant continued to sweat and seem nervous and aggravated.  (Id. at 36; see also id. at 192-93.)  Not long after, Officer Michael Greeley, who had also heard the 911 dispatch request for someone to investigate a suspicious person at the high school, arrived at the scene in his police vehicle.  (Id. at 33.)  Officer Greeley parked his

---

[2]  Cpl. Doyle twice demonstrated these movements for the Court.  (See N.T. 12/9/21 at 27, 101-02.)

3

vehicle at an angle to the right of Defendant's truck, in the parking spot to the right of the truck, perpendicular to the truck, not behind it, and with at least five feet between his vehicle and Defendant's. (Id. at 36-37, 109, 115.)  At no point in time was Defendant's truck blocked in so that Defendant would not be able to back up his truck and leave. (Id. at 44, 109-110.)  Once Greeley exited his vehicle, Cpl. Doyle asked Defendant to step out of the truck.  (Id. at 37-38.)

When Defendant exited the truck, Cpl. Doyle observed a gym bag on the driver's seat.  (Id. at 38.)  An object was sticking out of the bag and Cpl. Doyle recognized the object as a vacuum constriction device, which he called a "penis pump." (Id. at 38-39; Gov't Hrg. Ex. 11-B.)  He could see that there was condensation in the pump, which he believed to indicate that it had recently been used. (N.T. 12/9/21 at 39, 100.)  Cpl. Doyle directed Defendant to the rear of the truck, where Officer Greeley was now standing, and then proceeded to conduct a minute-long search of the truck, in part to make sure that there were no weapons concealed there. (Id. at 40, 123.)  He found two airplane bottles of fireball whisky behind the driver's seat, and a cell phone underneath the rear passenger seat. (Id. at 41.)  He did not open or search the cell phone at that time. (Id. at 41.)  In fact, he left the phone in the truck where he found it.  (Id. at 52.)

Cpl. Doyle asked Defendant about the penis pump, and Defendant denied that it was his.  (Id. at 42, 183.)  Cpl. Doyle again asked what Defendant was doing in the parking lot during early dismissal, and Defendant stated again that he was meeting a friend and provided a first name that started with an "E" (hereinafter, referred to as "E.").  (Id. at 42, 123.)  Upon further questioning, Defendant stated that E. was not a student at the school and was 18 years old.  (Id. at 43-45, 124, 183; see also id. at 191.)  Cpl. Doyle also asked Defendant for E.'s last name and "after a little while," Defendant stated that her last name was "Peppin," although this was later determined to be untrue. (Id. at 42-43.)  During this questioning, Officer Greeley observed that Defendant appeared nervous and combative and only

4

provided short answers to Cpl. Doyle's questions, which Officer Greeley considered evasive.  (Id. at 111-12, 123.)

By this time, a third law enforcement officer, Lieutenant (now Captain) Dougherty had arrived at the scene at 11:14 a.m., and parked about fifteen feet away from the others.  (Id. at 43-44; Gov't Hrg. Ex. 1 at 2.)  Like the others, he did not block in Defendant's vehicle.  (N.T. 12/9/21 at 112-13.) Cpl. Doyle asked Lieutenant Dougherty to go to the high school and identify all students with the first name that Defendant had provided.  (Id. at 45.)  Lieutenant Dougherty learned from the high school administration that there was only one student with that first name and that she was fifteen years old. (Id. at 45-46.)  In the meantime, Cpl. Doyle called Sergeant Kenneth Bellis, his supervisor at ICAC, provided the Sergeant with Defendant's name, and said he suspected Defendant of criminal activity. (Id. at 47, 147-48.)  Sergeant Bellis told Cpl. Doyle that the name was familiar, determined that Defendant had been the subject of an earlier investigation, and then advised Cpl. Doyle that Defendant was the subject of an open case in Connecticut and should be brought by Cpl. Doyle to the station.  (Id. at 47-48, 148-49.)

Cpl. Doyle then handcuffed Defendant, placed him in the rear of his police vehicle, and transported him to the Ridley Township police station at 11:29 a.m.  (Id. at 48; Gov't Hrg. Ex. 1 at 3.) Before leaving the scene, Cpl. Doyle asked Defendant if he wanted his keys, wallet and phone, which was his standard procedure, and Defendant stated that he wanted those items.  (N.T. 12/9/21 at 48.) Cpl. Doyle therefore recovered the phone from the truck and brought the requested items back to the police station when he transported Defendant there.  (Id. at 50-52.)

After receiving Cpl. Doyle's call, Sergeant Bellis also went to the Ridley Township police headquarters, where he knew Defendant was being taken.  (Id. at 149.)  Sergeant Bellis had been involved in a 2018 investigation of child sexual assault allegations involving Defendant and the same fifteen-year-old child that had been identified as the only student with the first name of "E." at the

Ridley High School.  (<u>See id.</u> at 136-47.)  The 2018 investigation had been prompted by E.'s father, who reported to the Delaware County Criminal Investigation Division ("CID") that he had discovered sexual communications on E.'s cell phone with a person he believed to be much older than E.  (<u>Id.</u> at 136-37.)  E.'s father turned over E.'s cell phone to CID and consented to a forensic exam of the phone, but CID also obtained a search warrant for the phone.  (<u>Id.</u>)  The forensic examination of the phone revealed sexually explicit messages between E. and Defendant, as well as sexual images sent from Defendant to E.  (<u>Id.</u> at 142-43.)  E. was interviewed on June 18, 2018 and stated that she had been communicating with Defendant for a number of years, since she was eleven years old.  (<u>Id.</u> at 145-46.)  At that point in time, Sergeant Bellis concluded that law enforcement had probable cause to arrest Defendant on state charges of unlawful contact with a minor, in violation of 18 Pa. C.S. § 6318, and criminal use of a communication facility, in violation of 18 Pa. C.S. § 7512.  (<u>Id.</u> at 146-47, 159.)  However, Sergeant Bellis instead referred the matter to the Federal Bureau of Investigation in Connecticut, where Defendant was living.  (<u>Id.</u> at 147.)

On the afternoon of June 7, 2019 (approximately one year later), after Cpl. Doyle arrested Defendant in the Ridley High School parking lot, E. and her parents came to the police station and met with Sergeant Bellis.  (<u>Id.</u> at 149.)  E. told Sergeant Bellis that Defendant had been at school that day in order to pick her up to have sex.  (<u>Id.</u>)  E. also told the Sergeant that she and Defendant had met three or four times prior and had engaged in sexual acts in his truck.  (<u>Id.</u> at 150.)  Sergeant Bellis also interviewed Defendant at the station.  (<u>Id.</u> at 150.)  Defendant first claimed that he had been "catfished," stating that he believed he was meeting an adult that day.  (<u>Id.</u>)  However, Sergeant Bellis then told Defendant that he did not want any lies and that he had already spoken with E.  (<u>Id.</u> at 150-51.)  Defendant reacted with surprise, screaming "You talked to her?"  (<u>Id.</u> at 151.)  Sergeant Bellis then read Defendant his <u>Miranda</u> rights, and Defendant declined to speak further.  (<u>Id.</u>)

Thereafter, Sergeant Bellis went to the Ridley High School parking lot, took photos of Defendant's truck, and arranged for the truck to be towed to an impound lot.  (Id. at 151-52.)  The photos of the truck that day show a colored towel spread out over the truck's back seat.  (Gov't Hrg. Ex. 7.)  Law enforcement did an initial inventory search of the truck prior to impoundment, pursuant to Ridley Township's standard procedures, and Sergeant Bellis also decided to apply for a search warrant to recover evidence from the truck.  (N.T. 12/9/21 at 50-51, 153.)  The search warrant that Sergeant Bellis obtained for the truck included coverage for DNA evidence.  (Id. at 155.)

The Ridley Township police also applied for and obtained search warrants for Defendant's phone  and iCloud account.  (Def.'s Mem. of Law in Support of Mot. to Suppress ("Def.'s Mem."), Exs. F & G.)  Detective Edward Pisani of Delaware County CID applied for and was granted the search warrant for Defendant's cell phone on June 13, 2019.   (Def.'s Mem., Ex. F.)  The cell phone's digital content was forensically analyzed, and an iCloud account associated with Defendant's Apple ID was detected.  (Def.'s Mem., Ex. G, Affid. ¶ 32.)  On September 11, 2019, Detective Pisani obtained the warrant to search the iCloud account.  (Id. at 1.)  As part of the forensic exam of Defendant's phone and online account, law enforcement recovered photographs of Defendant using the same penis pump that was found in the truck, as well as other sexual content, including images and video depicting Defendant engaged in sexual activity with E.  (N.T. 12/9/21 at 157-58; Def.'s Mem., Ex. G, Affid. ¶¶ 27-31.)  E. also recounted at the December 9, 2021 hearing that she had seen Defendant use the penis pump before, and that the plan on June 7, 2019 was that he was to use the pump while he waited for her, in preparation for their sexual encounter.  (N.T. 12/9/21 at 165-66.)

## II.    LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Courts may exclude evidence from being admitted at trial if it was obtained during the course of an

unreasonable search or seizure.  Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).  "[T]he exclusionary rule also prohibits the introduction of derivative evidence . . . that is the product of the primary evidence, or that is otherwise acquired as an indirect result of [an] unlawful search, up to the point at which the connection with the unlawful search becomes 'so atten[]uated as to dissipate the taint.'"  Murray v. United States, 487 U.S. 533, 536-37 (1988) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)) (citing Wong Sun, 371 U.S. at 484-85).  Ordinarily, it is the defendant's burden to demonstrate that a search or seizure was unreasonable.  United States v. Acosta, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992) ) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).  However, when the police conduct a search or seizure without a warrant, "the burden shifts to the government to show that the search or seizure was reasonable."  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).  The burden of proof is preponderance of the evidence.  United States v. Mastronardo, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing United States v. Matlock, 415 U.S. 164, 178 n.14 (1974)).

## III.    DISCUSSION

In his Motion to Suppress, Defendant seeks to suppress all of the evidence detailed above, arguing that he was initially seized in a Terry Stop without reasonable suspicion and that the search of his vehicle was without probable cause.   He maintains that all of the evidence he seeks to suppress is either fruit of his unlawful seizure or the unlawful search of his vehicle.   The Government opposes Defendant's Motion in all respects.

### A.   The Terry Stop

A police officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30  (1968)); Kansas v. Glover, 140 S. Ct. 1183, 1187 (2020) (permitting officer to "initiate a brief investigative traffic stop when he had a 'particularized and objective basis for suspecting the particular person stopped of criminal

activity'" (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Such a stop is commonly known as a "Terry stop."  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  Glover, 140 S. Ct. at 1187 (quotation and citation omitted)); Wardlow, 528 U.S. at 123 (stating that reasonable suspicion requires only "a minimal level of objective justification for the stop" (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).   To make a showing of reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.'"  Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27).  The court, in assessing reasonableness, must consider "the totality of the circumstances, which can include [the defendant's] location, . . . [the defendant's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'" Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (quoting Wardlow, 528 U.S. at 124-25) (additional citation omitted).  An officer may also rely on "information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip."  United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002).

　　　In evaluating whether an officer had reasonable suspicion to seize a suspect, the court must consider the facts known to the officer at the time that the seizure occurred.  See Johnson, 332 F.3d at 206.  Accordingly, the first step in a court's reasonable suspicion analysis is ascertaining the point in time at which the defendant was seized.  Brown, 448 F.3d at 245.  Under the Fourth Amendment, a person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  "A seizure occurs when there is either (a) 'a laying of hands or application of physical

force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" Id. (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting Hodari D., 499 U.S. at 628). Under these guidelines, a seizure is not effectuated by an officer merely approaching a car in which a defendant is sitting. See U.S. v. Williams, 413 F.3d 347, 354 (3d Cir. 2005) ("Merely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment."); United States v. Johnson, 63 F.3d 242, 206 (3d Cir. 1995) (holding that police officers did not "stop" defendant sitting in car until a few seconds into the encounter, when it became clear that defendant was not free to go). In addition, an officer "do[es] not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." Illinois v. Lidster, 540 U.S. 419, 425 (2004) (second alteration in original) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)) (citation omitted).

In arguing in his Motion that he was seized without reasonable suspicion upon Cpl. Doyle's arrival at the parking lot on June 7, 2019, Defendant asserted that Cpl. Doyle pulled up his police vehicle behind Defendant's truck and blocked Defendant into his parking spot. He also testified at the December 9, 2021 hearing that Cpl. Doyle blocked him in. (N.T. 12/9/21 at 173-74.) However, in his Proposed Findings of Fact and Conclusions of Law, Defendant appears to concede that "[t]he most reasonable conclusion the Court can draw from [the hearing] testimony is that [Defendant] is mistaken as to [where] Cpl. Doyle parked." (Def.'s Findings of Fact and Conclusions of Law ("Def.'s FoF & CoL") at 4 n.4.) In any event, we have already found, based on the hearing testimony

from Cpl. Doyle, Officer Greeley, and E., that Cpl. Doyle pulled into the parking spot next to Defendant

and that Defendant was never blocked into his spot.  (N.T. 12/9/21 at 23, 106, 109-10, 164.)

Based on this specific finding and our other findings of fact, we conclude that Defendant was

not seized in a Terry stop until Cpl. Doyle ordered him to step out of the truck, i.e., when Defendant

submitted to Cpl. Doyle's show of authority.  Brown, 448 F.3d at 245.  Prior to this time, no seizure

had occurred because Cpl. Doyle had merely approached Defendant in a public place and asked him

questions.  See Lidster, 540 U.S. at 425.   Indeed, the law is clear that "[e]ven when law enforcement

officers have no basis for suspecting a particular individual, they may pose questions [and] ask for

identification [without violating the Fourth Amendment] . . . provided they do not induce cooperation

by coercive means."  United States v. Drayton, 536 U.S. 194, 201 (2002); see also United States v.

Williams, 413 F.3d 347, 349 (3d Cir. 2005) (finding no seizure when four police officers "approached

[a parked van] in their marked cruiser, exited their vehicle, and approached the parked van on foot")

In this case, there is no credible evidence that Cpl. Doyle or any other member of law enforcement

used any coercive means to obtain Defendant's cooperation before Cpl. Doyle asked Defendant to step

out of the car.[3]

---

[3] Having apparently abandoned his argument from his Motion that Cpl. Doyle seized him by parking the police vehicle behind his truck, Defendant argues in his post-hearing submission that he was nevertheless seized when Cpl. Doyle "stationed himself next to [Defendant's] driver's side and began interrogating him."  (Def.'s FoF & CoL at 4 n.4.)  However, in support of this position, Defendant primarily relies on United States v. Hester, 910 F.3d 78 (3d Cir. 2018), which is easily distinguishable from the instant case as it involved a situation in which two police vehicles pulled up around a parked car, and four officers exited the police vehicles and positioned themselves around the car on foot, "near any potential exit points," making it impossible for the driver to drive away when questioned.  Id. at 85-86.  In the instant case, Cpl. Doyle did not physically block Defendant into his parking spot and, thus, this case is controlled by the case law that holds that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991); Drayton, 536 U.S. at 201 (finding no seizure where police pose questions and ask for identification, without engaging in coercion).

We also conclude that when Cpl. Doyle asked Defendant to get out of the truck, he possessed reasonable suspicion that criminal activity was underway.  At that point in time, Cpl. Doyle had received a report of a concerned citizen's 911 call about a suspicious pick-up truck with out-of-state plates in a school parking lot.  He had been informed that the caller had described the driver as a 30-year-old male, who had asked the caller for a jump, "seemed very nervous" and aggravated, and "look[ed] out of place."  (Gov't Hrg. Ex. 1 at 1.)  Thereafter, Cpl. Doyle had observed Defendant appearing to resituate himself in his seat as he approached the truck, and had viewed his shorts partially down, with skin on the side of his buttocks in plain view.  He had also learned from Defendant that Defendant was 26 years old, from Connecticut, and had just driven to the high school from Connecticut to meet a "friend."  In addition, he had observed Defendant looking nervous and sweating.  Finally, Cpl. Doyle knew that this was a day on which students were being dismissed early from the high school, and he could see students milling around the parking lot.

These facts were sufficient to meet the "minimal level of objective justification for the stop." Wardlow, 528 U.S. at 123.  Indeed, "the totality of the circumstances," including, but not limited to, the Defendant's travel from Connecticut to the school parking lot during early dismissal, purportedly to meet a "friend" (N.T. 12/9/21 at 30), his nervous behavior, and Cpl. Doyle's "'commonsense judgments and inferences about human behavior,'" Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (quoting Wardlow, 528 U.S. at 124-25), all supported the conclusion that Defendant was engaged in some sort of criminal activity and provided "a minimal level of objective justification for the stop," Wardlow, 528 U.S. at 123 (citation omitted).  We therefore conclude that the Government has established that Defendant's Terry stop was supported by reasonable suspicion and comported with the Fourth Amendment's requirements.  We therefore deny Defendant's Motion insofar as it argues that Defendant's seizure was unreasonable and unconstitutional.

Moreover, we note that Defendant's only argument in favor of suppression of his statements to Cpl. Doyle in the parking lot and E.'s cell phone and iPad are that they were the fruits of his unlawful seizure.  (See, e.g., Def.'s Mem. in Support of Mot. to Suppress ("Def.'s Mem."), at 20 ("[Defendant's] statements and their fruits – specifically [E.'s] cell phone and iPad and their contents . . . , must be suppressed as the fruit of the unlawful stop of [Defendant]").)  Because we find that Defendant's Terry stop conformed to constitutional requirements, we necessarily also conclude that neither Defendant's statements nor E.'s cell phone and iPad were the fruits of an unlawful stop.[4]  For these reasons, we specifically deny Defendant's Motion insofar as it seeks to suppress his statements to Cpl. Doyle, as well as E.'s cell phone, iPad, and their contents.

**B.   The Search of the Truck**

Defendant also argues that the search of his truck without a warrant following the seizure was not supported by probable cause.  Under the automobile exception to the search warrant requirement, "where there [is] probable cause to search a vehicle 'a search is not unreasonable if [it is] based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'"  Maryland v. Dyson, 527 U.S. 465, 467 (1999) (quoting United States v. Ross, 456 U.S. 798, 809 (1982)).  Probable cause exists "when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

In this case, we conclude that the discovery of the vacuum constriction device that appeared to have been recently used, in combination with the facts and circumstances giving rise to reasonable

---

[4] In addition, we conclude that Defendant does not have standing to move to suppress E.'s cell phone, iPad, and their contents, because a movant must establish that "he personally has a legitimate expectation of privacy" in the objects searched or seized, and Defendant has "made no claim that he ever owned, possessed, used, or had any privacy interest whatsoever in [E.'s electronic devices]." United States v. Gatson, 744 F. App'x 97, 99 (3d Cir. 2018) (quotations omitted).

suspicion resulted in a "fair probability that . . . evidence of a crime w[ould] be found in" Defendant's truck.  Id. at 305 (quoting Gates, 462 U.S. at 238).  Accordingly, those facts and circumstances were sufficient to support a search under the automobile exception to the search warrant requirement and Cpl. Doyle's seizure of items from the truck was constitutional.  However, even if this were not the case and the limited search that Cpl. Doyle conducted was unconstitutional, we would not suppress the evidence that Defendant apparently seeks to suppress as a result of that search (the vacuum constriction device, his cell phone and its contents, his wallet, the towel, the alcohol bottles, and the contents of his iCloud account)[5] for a variety of reasons, including the inevitable discovery exception to the exclusionary rule and the independent source doctrine. [6]

    1.  Vacuum constriction device

---

[5]  Defendant is not precise as to what he contends was seized in the allegedly unlawful search.  Moreover, the testimony at the December 9, 2021 hearing suggests that the only item that was actually seized from the truck contemporaneously with the search was the vacuum constriction device.  Nevertheless, we will assume for purposes of resolving Defendant's Motion that, as Defendant contends, all of the items in the car were unlawfully seized pursuant to Cpl. Doyle's search.

[6] Notably, in response to the Government's arguments regarding the independent source doctrine and the inevitable discovery rule, Defendant only briefly mentions those two doctrines twice.  First, he argues that "[s]hould the court find that Defendant was seized prior to the police learning his identity, the government's arguments that the evidence sought to be suppressed is nevertheless admissible under the independent source doctrine and/or inevitable discovery rule completely fail as a matter of law."  (Def.'s FoF & CoL at 10 n.8.)  Second, he argues that "[s]hould the Court agree that [Defendant] was arrested prior to the officers learning of the earlier investigation involving [E.], the government's argument that the evidence sought to be suppressed is nevertheless admissible under the independent source doctrine again fails as a matter of law."  (Id. at 23 n.10.)  Here, we have found that that Defendant was lawfully seized after the police learned his identity and was arrested after Cpl. Doyle learned of the 2018 investigation.  Accordingly, we reject Defendant's only arguments regarding application of the independent source doctrine and inevitable discovery rule because those arguments have as their factual premise that we would make findings contrary to those that we have made.

As explained above and detailed in our findings of fact, when Defendant stepped out of the truck at Cpl. Doyle's request on a constitutional <u>Terry</u> stop, the vacuum constriction device that he now seeks to suppress was in plain view in the front seat.[7]  Cpl. Doyle seized the vacuum constriction device without a warrant at that time.  (<u>See</u> N.T. 12/9/21, at 122.)

Even if this seizure was unlawful because there was not probable cause for the search, the inevitable discovery doctrine dictates that the device should not be suppressed.  Under the inevitable discovery exception to the exclusionary rule, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [that underlies the exclusionary rule] has so little basis that the evidence should be received."  <u>United States v. Vasquez De Reyes</u>, 149 F.3d 192, 195 (3d Cir. 1998) (first two alterations in original) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984)).  For the exception to apply, the Government must establish that "the police, following routine procedures, would inevitably have uncovered the evidence."  <u>Id.</u>  The inevitable discovery analysis focuses on

---

[7] Defendant testified at the hearing that, contrary to Cpl. Doyle's testimony, the vacuum constriction device was fully secreted in an opaque bag in the middle front seat of the truck, and that Cpl. Doyle discovered the bag and opened it during his search of the truck.  (N.T. 12/9/21, at 181-83.)  In support of this version of events, he also points to the testimony from Officer Greeley that, to the best of his recollection, he saw Cpl. Doyle recover the drawstring bag out of the back driver side of the vehicle during his search.  (<u>Id.</u> at 122.)  However, we do not credit Defendant's testimony in this regard, in part due to his admitted previous lies to police regarding E.'s age and whether she was a student at the high school, as well as his proven lie that the vacuum constriction device was not his.  (<u>See id.</u> at 183, 191.)  We also find Defendant's version untrustworthy based on Cpl. Doyle's testimony as to where and how he found the device and E's testimony that her plan with Defendant was that he would use the vacuum constriction device while waiting for her in the parking lot.  (<u>See id.</u> at 38-30, 165-66.)  In addition, we discount Officer Greeley's testimony regarding Cpl. Doyle's recovery of the bag because his recollection as to the details of Cpl. Doyle's search was periodically halting, and his "main objective at the time [of the search] was just to keep an eye on . . . the defendant."  (<u>Id.</u> at 117; <u>see generally id.</u> at 118-122.)   For these reasons, we have found as fact that the Cpl. Doyle found the vacuum constriction device on the driver's seat, partially out of the bag as he has testified.

"historical facts capable of ready verification, not speculation." United States v. Stabile, 633 F.3d 219, 245 (3d Cir. 2011) (quoting Vasquez De Reyes, 149 F.3d at 195) (citing Nix, 467 U.S. at 444 n. 5).

Here, the Government has established that when Sergeant Bellis went to the school parking lot to take photographs of and impound Defendant's truck, he followed standard procedures in overseeing an inventory search of the truck in conjunction with its impoundment. (N.T. 12/9/21, at 50-51, 152-53.) During the inventory search, it is inevitable that he would have found the vacuum constriction device in the truck had it not already been seized by Cpl. Doyle. In addition, the device would have also been subject to seizure pursuant to the subsequently obtained search warrant for the truck. (See id. at 155.) We therefore refuse Defendant's request to suppress the vacuum constriction device upon application of the inevitable discovery doctrine. We therefore deny Defendant's Motion insofar as it requests that we suppress the vacuum constriction device.

2. Defendant's cell phone and wallet

Unlike the vacuum constriction device, Defendant's wallet and cell phone were not immediately seized by Cpl. Doyle in connection with his search of the truck on June 7, 2019. Rather, Cpl. Doyle specifically testified that although he found the cell phone underneath the rear passenger seat in his search, he did not open or search the phone at the time, and he instead simply left the phone where he had found it. (Id. at 41, 52.) Upon Defendant's arrest, he asked Defendant if he wanted his wallet, keys, and cellphone, recovered the phone from the car, and transported the requested items to the station along with Defendant. (N.T. 12/9/21 at 48, 52.) Accordingly, contrary to Defendant's assertion in his Motion, Cpl. Doyle did not seize the cell phone or wallet in connection with his search of the truck or as a result of that search; rather, those items were subsequently seized in connection with Defendant's arrest (see Def.'s Mem., Ex. G, Affid. ¶¶ 25, 27), which Defendant's Motion to

Suppress did not dispute was grounded in probable cause.[8]  Defendant does not challenge law enforcement's entitlement to seize his cell phone and wallet upon arrest in order to guard against the destruction of evidence.  See, e.g., Riley v. California, 573 U.S. 373, 388 (2014) (stating that defendant made a "sensible concession" " that officers could . . . seize[] and secure[] their cell phones to prevent destruction of evidence while seeking a warrant," citing Supreme Court precedent).  And, pursuant to the inevitable discovery doctrine, we conclude that the cell phone and wallet would have been seized in connection with the inventory search and impoundment of the truck in any event.  Vasquez De Reyes, 149 F.3d at 195.  Accordingly, we reject Defendant's argument that his cell phone and wallet were seized in an unlawful search and find that, in any event, they would nevertheless be admissible pursuant to the inevitable discovery doctrine.  We therefore deny Defendant's Motion insofar as he seeks to suppress his cell phone and wallet.

---

[8] Defendant argues for the first time in his post-hearing submissions that there was no probable cause for his arrest.  However, we have found as a fact that, prior to Defendant's arrest, Cpl. Doyle called Sergeant Bellis from the high school parking lot, and that Sergeant Bellis told Cpl. Doyle that Defendant had an open case in Connecticut and told Cpl. Doyle to bring Defendant to the station.  We have also found as fact that Delaware County CID had abundant evidence against Defendant from its earlier 2018 investigation, including evidence of sexually explicit chats between Defendant and E. and sexually explicit photographs that Defendant sent to E. Significantly, Defendant does not argue that there was no probable cause to arrest him if, in fact, Cpl. Doyle and Sergeant Bellis spoke on the phone in the parking lot, as they have testified.  (Def.'s FoF & CoL at 23 (arguing that "[a]bsent the information provided by Sgt. Bellis, officers on the scene did not have probable cause to arrest [Defendant]").)  Instead, Defendant urges us to find that Cpl. Doyle did not call (and receive information from) Sergeant Bellis from the parking lot, pointing to, inter alia, Officer Greeley's testimony that he did not recall Cpl. Doyle calling Sergeant Bellis from the scene and only saw Cpl. Doyle call Sergeant Bellis from the police station.  (N.T. 12/9/21 at 127-28).  We, however, credit the testimony of the parties to that disputed call—Cpl. Doyle and Sergeant Bellis—both of whom testified that the phone call occurred from the parking lot.  (Id. at 47, 147.)  In light of our factual findings concerning that call and the 2018 investigation, there can be no dispute that there was probable cause for Defendant's arrest.

### 3.   Contents of Defendant's cell phone and iCloud account

Defendant argues that the digital evidence recovered from Defendant's cellphone and iCloud account must be suppressed as the fruit of an unlawful search.[9]   Specifically, Defendant argues that the warrants that law enforcement obtained to search Defendant's cell phone and iCloud account relied on information and items obtained during Cpl. Doyle's unlawful search of his truck.

"Typically, the exclusionary rule requires that we suppress evidence obtained as a result of an illegal search." United States v. Stabile, 633 F.3d 219, 243 (3d Cir. 2011) (citing Wong Sun, 371 U.S. at 485). "However, '[t]he independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of 'evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality.'" Id. (quoting United States v. Price, 558 F.3d 270, 281 (3d Cir. 2009)). In determining whether there was an independent source, we must determine whether the "illegal search is so intertwined with the eventual acquisition of the [evidence at issue] that the [evidence at issue] must be suppressed. Id. In making this determination, a court asks "(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search . . . prompted the officers to obtain the [subsequent] search warrant." Id. (second alteration in original) (quoting Herrold, 962 F.2d 1131, 1144 (3d Cir. 1992)) (citing Price, 558 F.3d at 282). "If the answers to these questions are yes and no respectively . . . then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible." Id. at 43-44 (quoting Herrold, 962 F.2d at 1144).

---

[9] Defendant also argues that this same digital evidence must be suppressed as the fruit of an unlawful stop. However, we have already concluded that there was nothing unlawful about the Defendant's Terry stop. Accordingly, we do not address this aspect of Defendant's argument for suppression of the digital evidence further.

Here, Defendant argues that "the court orders authorizing the searches of [his] cellphone and iCloud accounts never would have been signed in the absence of evidence illegally obtained by Cpl. Doyle and Officer Greeley on June 7, 2019." (Def.'s Mem. at 23-24.) However, a review of the affidavits in support of the search warrants at issue makes clear that their issuance was not dependent on any evidence that Defendant claims was seized by Cpl. Doyle and/or Officer Greeley on June 7, 2019, and that the June 7, 2019 search did not prompt Detective Pisani and/or Sergeant Bellis to apply for those search warrants. (See Def.'s Mem., Exs. F & G.)

The affidavit in support of the warrant for Defendant's cell phone includes the information that, in 2018, E.'s father turned over E.'s cell phone to Delaware County CID, and told CID that E. was 14 years old, and that he had found naked pictures of an adult male being sent to her. (Def.'s Mem., Ex. F, Affid. ¶ 9.) It further details that, in an interview in 2018, E. provided law enforcement with Defendant's name and address, and stated that she had been communicating with him since sixth grade, that Defendant knew her age, and that they had exchanged nude pictures and videos through snapchat. (Id. ¶ 10.) In addition, the affidavit states that, on June 7, 2019, Cpl. Doyle had investigated a 911 call, found Defendant in his truck in the Ridley High School parking lot with his pants partially down, and viewed a penis pump containing condensation on his seat. (Id. ¶ 11.) The affidavit adds that, on that same date, E. stated in an interview that she had engaged in sexual activity with Defendant on three prior occasions, and that they were going to have sexual intercourse that day, but that she saw the police as she was walking to Defendant's truck to meet him. (Id. ¶ 12.) E. also confirmed to law enforcement that she communicated with Defendant through his cellular phone, and she identified several social media applications that they used to exchange naked photos. (Id.) Given these facts that were included in the affidavit, we find that no unlawfully obtained information was necessary to make out probable cause. Rather, the information from the 2018 investigation and the 2018 and 2019 interviews with E., along with Defendant's mere presence in the parking lot on June 7, 2019 were

19

sufficient to establish probable cause for issuance of a warrant for the cellular phone.  Thus, we conclude that a neutral justice would have issued the search warrant for the cell phone irrespective of any information or evidence that Defendant contends was unlawfully obtained, and no unlawful search prompted the application for the warrant.  See Stabile, 633 F.3d at 243.

Similarly, the federal warrant to search Defendant's iCloud account was based on an affidavit that primarily relied upon information concerning the 2018 investigation, which it described in great detail, the 2019 interview with E., and the results of the 2019 forensic examination of Defendant's cell phone.  (Def.'s Mem., Ex. G, Affid. ¶¶ 10-20, 22-23, 27-31.)  While one paragraph of the affidavit gave information about the June 7, 2019 arrest (id. ¶ 21), and mentions the vacuum constriction device and towel, which Defendant claims were unlawfully seized, there can be no question that a neutral justice would have issued the search warrant even if not presented with information about the vacuum constriction device and towel.   In addition, we conclude that the June 7, 2018 search did not prompt Delaware County CID to obtain the search warrant for the iCloud account.

In sum, we conclude that, even if the search of Defendant's truck were unlawful, the exclusionary rule does not apply to the contents of Defendant's cell phone and iCloud in light of the independent source rule and the independent validity of the two search warrants at issue.   Thus, we deny Defendant's Motion to Suppress insofar as it concerns the contents of Defendant's cellphone and iCloud account.

### 4.   Towel and alcohol bottles

Lastly, Defendant seeks to suppress the towel and alcohol bottles that were in the truck.  Although Cpl. Doyle viewed the towel on the back seat of the truck when he was lawfully detaining Defendant, he did not seize the towel, but left it in place. (Gov't Hrg. Ex. 7.)  Indeed, when Sergeant Bellis subsequently went to the parking lot to impound the truck, the towel remained in place on the back seat of the truck.  (See id.)  It is not clear what happened to the two airplane bottles of Fireball

whisky, although there was also no testimony at the hearing that would support a conclusion that they were actually seized from the truck at the time of Cpl. Doyle's search.  Under these circumstances, we conclude that the towel was lawfully recovered during the inventory search of the truck and/or in the subsequent search of the truck pursuant to the unchallenged search warrant for the truck.  We further conclude that (1) the alcohol bottles were lawfully recovered during the inventory search of the truck and/or in the subsequent search of the truck pursuant to the unchallenged search warrant, or (2) if the bottles were seized in Cpl. Doyle's search, they are nonetheless admissible under the inevitable discovery doctrine because they would have been recovered pursuant to the inventory search or lawful search warrant.  See Vasquez De Reyes, 149 F.3d at 195.  We therefore deny Defendant's Motion insofar as it seeks to suppress the towel and the alcohol bottles.

## IV.     CONCLUSION

For the foregoing reasons, we deny Defendant's Motion to Suppress in its entirety.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.